# MENOTTI *v.* DILLON.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 309. Submitted April 28, 1897. — Decided May 24, 1897.

The land in controversy, being 240 acres situated in California, was settled upon and improved in good faith by H., in 1858, with the intention of taking, at the proper time, the necessary steps to acquire the title thereto from the United States, by procuring its location in part satisfaction of the grant made by the United States to the State of California of 500,000 acres of land; and then of purchasing the land in question from the State. In June, 1864, H., in proper form, made application to the State, under the act of California approved April 27, 1863, for the sale of certain lands, to locate this land as a "lieu school land location," and to purchase it from the State. This application and offer to purchase were approved by the State's locating agent upon the condition that "if said location should be made and approved by the United States, it should be for the use and benefit of said applicant upon his complying with all the conditions and provisions of the said act of April 27, 1863." Subsequently, February 28, 1865, the State's agent, proceeding under the state law, located this land in lieu of a portion of those which had been lost to the State, at the request and for the use of H., by filing an application for the same in the United States land office at San Francisco. This application to purchase was completed, so that on the 31st day of August, 1865, H. received from the State a certificate of purchase in due form. Menotti, the plaintiff in error, claims under H. At the time the above application was filed in the land office at

San Francisco, the lands in controversy were withdrawn from preëmption, private entry and sale, by order of the Land Department, for the benefit of a railroad company which had filed its map of *general* route under the acts of Congress of July 1, 1862, 12 Stat. 489, c. 120, and July 2, 1864, 13 Stat. 356, c. 216, granting lands to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean. By the act of Congress of July 23, 1866, 14 Stat. 218, c. 219, quieting land titles in California, it was provided that "in all cases where the State of California has heretofore made selections of any portion of the public domain in part satisfaction of any grant made to said State by any act of Congress, and has disposed of the same to purchasers in good faith under her laws, the lands so selected shall be, and hereby are, confirmed to said State." This act excepted from its operation "lands to which any adverse preëmption, homestead or other right has, at the date of the passage of this act, been acquired by any settler under the laws of the United States, or to any lands which have been reserved for naval, military or Indian purposes by the United States, or to any mineral land, or to any land held or claimed under any valid Mexican or Spanish grant, or to any land which, at the time of the passage of this act, was included within the limits of any city, town or village, or within the county of San Francisco." The railroad company filed its map of definite location in 1870. In 1872 the plaintiff in error, claiming under the purchaser from the State, made application to the proper officers of the United States Land Department for a confirmation of the right of said State to said land so selected by said State for his benefit, under the provisions of the above act of Congress July 23, 1866, and thereupon, and upon due notice to the railroad company and the parties claiming under it, such proceedings were regularly had in said department and such proofs submitted, and such a hearing had, that on the 15th day of May, 1874, the Commissioner of the General Land Office, under the direction and with the approval of the Secretary of the Interior, listed over and certified to said State this 240 acres of land "as confirmed to said State of California." In 1875, Menotti received a patent from the State. The railroad company received a patent from the United States in 1872, but this was after the above proceedings under the act of 1866 were initiated. *Held,*

(1) That the act of July 1, 1862, as amended by the act of July 2, 1864, did not grant to the railroad company any lands which had been sold, reserved or disposed of by the United States, nor impair any existing "lawful claim," at the time the line of railroad was "definitely fixed."

(2) The act of 1866 did not except from its operation lands within the exterior lines of the general route of the railroad, and which, for the benefit of the railroad company, had been withdrawn by executive order from preëmption, private entry and sale. The withdrawal order of 1865 did not stand in the way of the passage of the act of 1866; first, because the acts of 1862 and 1864 by necessary implication recognized the right of Congress to dispose

of the odd-numbered sections, within certain limits on each side of the road, or any of them, at any time prior to the definite location of the line of the railroad; second, both acts reserved to Congress the power to alter, amend or repeal them; third, the filing of the map of general route gave the railroad company no claim to any specific lands within the exterior limits of such route on either side of the road, the rule being that a grant of public lands in aid of the construction of a railroad is, until its route is established, in the nature of a " float," and title does not attach to any specific sections until they are identified by an accepted map of definite location of the line of the road. The railroad company accepted the grant subject to the possibility that Congress might, in its discretion, and prior to the definite location of its line, sell, reserve or dispose of enumerated sections for other purposes than those originally contemplated. Consequently, at the date of the definite location of the railroad in 1870, there was a "lawful claim" upon these lands based on the act of 1866, which confirmed to the State, for the benefit of those who had purchased from it in good faith, lands embraced by its provisions.

THE case is stated in the opinion.

*Mr. S. F. Leib* for plaintiff in error.

*Mr. A. L. Rhodes* for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was commenced in the District Court of the third judicial district of California.

The complaint alleged that on the 23d day of April, 1873, the original plaintiff, Charles McLaughlin, became the owner in fee simple and entitled to the possession of the south half of section twenty-one, in township seven south, of range three west, of the Mount Diablo base and meridian, according to the United States survey; that thereafter he continued to be the owner and was entitled to the possession of said land; but that on the above date the defendant Menotti entered into possession, ousted him and continued to hold possession, to his damage in the sum of one thousand dollars.

The answer of the defendant denied each allegation of the complaint. McLaughlin died, and his estate was distributed to the present appellees who were substituted as plaintiffs.

There have been two trials of the case, each time by the court without the intervention of a jury. The first judgment, which was for the defendant, was reversed by the Supreme Court of California because of the insufficiency of the finding of facts bearing upon the question of title. 89 California, 354. The last judgment was also for the defendant; but it was reversed, and the cause remanded with directions to enter judgment in favor of the plaintiffs for the lands in controversy, and for rents and profits. *McLaughlin* v. *Menotti*, 105 California, 572. From that decree a writ of error was sued out to this court.

The case made by the agreed statement of facts, and by the evidence introduced at the trial, was substantially as follows:

The Central Pacific Railroad Company of California executed, October 31, 1864, an assignment to the Western Pacific Railroad Company of the right to construct its road between San José and Sacramento, and of its right accruing to it by virtue of the acts of Congress of July 1, 1862, 12 Stat. 489, c. 120, and July 2, 1864, 13 Stat. 356, c. 216, to the land in controversy in this action. This assignment was ratified by Congress March 3, 1865. 13 Stat. 504, c. 88.

On the 8th day of December, 1864, the Western Pacific Railroad Company filed in the office of the Secretary of the Interior a map designating the general route of its road. A copy of that map was received at the United States land office at San Francisco on the thirtieth day of January, 1865, accompanied by an order from the Secretary reserving from preëmption, private entry and sale for the benefit of the railroad company the odd-numbered sections of land within twenty-five miles on either side of the line of such general route. This reservation was in force from the day last mentioned.

On February 20, 1870, the Central Pacific Railroad Company filed in the Department of the Interior the map of the definite location of its railroad between San José and Sacramento; but the road opposite the land in controversy, between San José and Niles, was completed about the first day of September, 1866.

On June 22, 1870, the Central Pacific Railroad Company of California and the Western Pacific Railroad Company consolidated under the name of the Central Pacific Railroad Company.

The official map of township seven south, range three west, Mount Diablo base and meridian was filed by the United States surveyor general for California in the United States land office at San Francisco on February 27, 1865. Prior to that date, and on or about the 10th day of June, 1864, a survey was made by a deputy United States surveyor for California of the part of that township embracing the land in controversy; but that survey was not made by authority of the Government of the United States. No actual survey of any portion of that township had ever been made before June, 1864, and up to that time no attempt had been made by any person, or by the Government, to have its boundaries ascertained, or to establish the lines of sections in that township.

The land in controversy in this action is within twenty miles of the line of definite location of the Central Pacific Railroad Company, and within twenty-five miles, but not within ten miles, from the line of the general route of the railroad.

On the third day of April, 1872, the United States duly executed and delivered to the Central Pacific Railroad Company a patent for the land in controversy, with other lands. It was in the usual form of patents issued under the Pacific railroad acts. And on the third day of April, 1873, that company executed to McLaughlin a deed conveying to him all its right, title and interest in this land.

At the commencement of this action the defendant was in the possession of the south half of the southeast quarter, and the southwest quarter of section twenty-one, of township seven south, range three west, Mount Diablo meridian, being two hundred and forty acres of the land described in the complaint, and of no more. No part of these lands are or were mineral lands, or were returned or denominated as mineral lands.

It was found that one Philip Hirleman settled upon and

improved this land as early as 1858; that it was "then used for pasturage, had a house upon it and was enclosed partly by a post and rail fence, and for the balance by gulches forming a natural enclosure"; that in June, 1864, and until December 6, 1866, it was occupied by him, and he had on the land during that time a house, barn, corrals, a small field of wheat and potatoes, and cows and horses. The finding states that he "was there all the time; had possession of about 1000 acres of land, including the land in controversy, which was enclosed by two fences and two gulches; each fence at each end thereof connecting with the gulches; the gulches and fences constituting an enclosure of the tract of about 1000 acres, including the land in controversy. The fences ran east and west; the northerly fence was between a half a mile to a mile in length and ran partly across section 21, and the south fence was upon a section lying south of section 21."

It was also found that "on January 30, 1865, the said Hirleman was, and had been prior thereto, and during the year 1864, and was, subsequent to the said 30th day of January, 1864, up to the time of the execution by him of the deed to Jean Peter, a settler in good faith on the land involved in this action, to wit, said 240 acres; and that the improvements hereinabove designated were made on the said land by him in good faith, and that such settlement by him, and the said improvements, were made with the intention in good faith of taking, at the proper time, the necessary steps to acquire the title to said land from the Government of the United States, by procuring its location in part satisfaction of the grant made by the Government of the United States to the State of California of 500,000 acres of land, by act of Congress of date ——; and then of purchasing the land involved in this action from the State of California."

During the years 1864 and 1865 Hirleman was a naturalized citizen of the United States; was then and had been since 1858 a resident in good faith of California and of the county of Santa Cruz, in which county the land involved in this action was then located; and was the head of a family, possessing all the qualifications necessary to enable him to acquire the

title from the Government of the United States to the land in controversy.

It also appears from the finding of the court that under and by virtue of the act of the legislature of the State of California of April 27, 1863, entitled "An act to provide for the sale of certain lands belonging to the State of California," Hirleman, on June 13, 1864, "in due and proper form, made application to Leander Ransom, who was then and there the duly appointed, qualified and acting locating agent of the State of California, under said act, to locate as a lieu school land location, and to purchase from said State, the said 240 acres of land involved in this action; which said application was accompanied with the affidavit of said applicant, in due and proper form, required by the act of April 27, 1863, and also with the affidavit of loyalty, in due and proper form, required by the act of April 27, 1863, and also the affidavits of three disinterested witnesses as to the character of said land, and the fact that no valid claim existed thereto adverse to said applicant's claim, as required by said act of April 27, 1863; and that said locating agent on June 16, 1864, duly accepted said application and affidavits and offer to purchase, upon the condition that if said location should be made and approved by the United States, it should be for the use and benefit of said applicant upon his complying with all the conditions and provisions of said act of April 27, 1863; and that said locating agent on February 28, 1865, in conformity with the provisions of said act, located in lieu of a portion of the lands of said State, which had been lost to said State, the said 240 acres of land involved in this action, at the request, and for the use of said Hirleman, by filing an application for the same in the name and for the State of California, in the United States land office at San Francisco, said land being within the San Francisco land district, with the consent of John F. Swift, who was then the duly appointed, qualified and acting register of said district; which said location made upon said Hirleman's application was filed in the state land office of the State of California on April 4, 1865, and was, by the surveyor general of said State, approved May 13, 1865; and that the treas-

urer of Santa Cruz County, within which county said land was then included, was, in the said order of approval, directed to receive in payment of said location, within fifty days from the recording of said approval, twenty per cent of the purchase money and one year's interest on the balance in advance, at the rate of ten per cent per annum, from the date of the location in the locating agent's office."·

On the fourth day of June, 1865, and within fifty days after the recording of the approval of Hirleman's location of June, 1864, payment was made by him to the treasurer of Santa Cruz County, in all respects as directed; and on the thirty-first day of August, 1865, a certificate of purchase, in due form, covering the land, was issued to him by the State of California upon his application.

On December 6, 1866, Hirleman conveyed by deed all his right, title and interest in and to these 240 acres of land to Jean Peter, who thereupon took and held possession of the same until March 9, 1867, when he conveyed, by deed, all his right, title and interest to the defendant Menotti, who thereupon entered into possession, and ever since has been and still is in possession.

The finding further states that after the twenty-third day of July, 1866, — the date of the passage of the act of Congress quieting land titles in California, — to wit, about the thirteenth day of March, 1872, "the defendant made application to the proper officers of the United States Land Department for a confirmation of the right of said State to said land so selected by said State for his benefit, under the provisions of the act of Congress entitled 'An act to quiet land titles in California,' approved July 23, 1866, 14 Stat. 218, c. 219; and thereupon, and upon due notice to said Western Pacific Railroad Company and the parties claiming under it, such proceedings were regularly had in said department and such proofs submitted, and such a hearing in said department had, that on the fifteenth day of May, 1874, the Commissioner of the General Land Office, under the direction and with the approval of the Secretary of the Interior, listed over and certified to said State the 240 acres of land as confirmed to said State of California."

On December 31, 1874, full payment upon this location was made to the State, through the proper county treasurer, by Menotti as assignee of Hirleman. And on February 25, 1875, the State issued to him, as such assignee, its letters patent, granting the 240 acres of land in question upon the application above mentioned.

It appears from the above statement that Menotti and those under whom he claims title have been in actual possession of the lands in controversy since 1858. Of Hirleman's good faith in settling upon, improving and purchasing them, no question can be made under the findings of fact. Nor is any question made as to the good faith of those claiming under him. It may also be stated that fifteen years had expired after Hirleman settled upon the land and commenced improving it before McLaughlin, the original plaintiff, obtained a deed from the Central Pacific Railroad Company.

The case is, therefore, one that appeals strongly to the court for the protection of the defendant who claims under an actual settler who in good faith purchased these lands from the State, and whose right thereto, as a claimant under the State, has been confirmed by the action of the Land Department.

It is necessary to a clear understanding of the precise question to be determined that reference be made to certain legislation by the United States and California.

By the act of Congress of March 3, 1853, entitled "An act to provide for the survey of the public lands in California, the granting of preëmption rights therein, and for other purposes," 10 Stat. 244, 246, c. 145, it was provided "that all the public lands in the State of California, whether surveyed or unsurveyed, with the exception of sections sixteen and thirty-six, which shall be and hereby are granted to the State for the purposes of public schools in each township, and with the exception of lands appropriated under the authority of this act, or reserved by competent authority, and excepting also the lands claimed under any foreign grant or title and the mineral lands, shall be subject to the preëmption laws of September fourth, eighteen hundred and forty-one, with all

the exceptions, conditions and limitations therein, except as is herein otherwise provided." § 6. By the same act it was provided "that where any settlement, by the erection of a dwelling house or the cultivation of any portion of the land, shall be made upon the sixteenth and thirty-sixth sections, before the same shall be surveyed, or where such sections may be reserved for public uses or taken by private claims, other land shall be selected by the proper authorities of the State in lieu thereof, agreeably to the provisions of the act of Congress, approved on the twentieth of May, eighteen hundred and twenty-six, entitled 'An act to appropriate lands for the support of schools in certain townships and fractional townships, not before provided for,' and which shall be subject to approval by the Secretary of the Interior." § 7.

The act of Congress of July 1, 1862, 12 Stat. 489, c. 120, relating to the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, contained a grant of the odd-numbered sections of public lands (excluding mineral lands) on each side of the road within certain limits "not sold, reserved or otherwise disposed of by the United States, and to which a preëmption or homestead claim may not have attached, at the time the line of said road is definitely fixed." (§ 3.) It provided that "Congress may, at any time, having due regard for the rights of said companies named herein, add to, alter, amend or repeal this act." (§ 18.) And by the act of July 25, 1864, 13 Stat. 356, c. 216, the above grant was enlarged, and it was provided (§ 4) — using the words of the act as published by the authority of Congress — that any lands granted by it, or by the above act of July 1, 1862, of which it was amendatory, "shall not defeat or impair any preëmption, homestead, swamp land, *or other lawful claim*, nor include any government reservation or mineral lands, or the improvements of any *bona fide* settler, or any lands returned and denominated as mineral lands, and the timber necessary to support his said improvements as a miner, or agriculturalist, to be ascertained under such rules as have been or may be established by the Commissioner of the General Land Office, in conformity with the provisions of the preëmp-

tion laws." That act provided that " Congress may, at any time, alter, amend or repeal this act." (§ 22.)

The legislature of California by the act of April 27, 1863, entitled " An act to provide for the sale of certain lands belonging to the State," Stat. Cal. 1863, c. 397, p. 591, made provision, among other things, for the sale of " the unsold portion of the 500,000 acres granted to the State for school purposes;" [1] and " the sixteenth and thirty-sixth sections granted for the use of the public schools, or lands in lieu thereof." § 2.

The same act of California (April 27, 1863) (§ 4) provided: " Whenever any resident of this State desires to purchase any portion of a sixteenth or thirty-sixth section of any township in this State, or lands in lieu thereof, if the lands sought to be purchased have not been surveyed by authority of the United States, he shall file in the office of the county surveyor of the county in which said lands are situate, an application for a survey and plat and field notes of the lands sought to be purchased, which, when obtained, he shall file with the locating agent of the district, together with an affidavit that he is a citizen of the United States, or has filed his intentions to become a citizen, that he is of lawful age, and is a resident of the State, that the lands sought to be purchased are unoccupied except by the applicant, and that there are no improvements on said lands other than his own, and that to the best of his knowledge and belief there is no valid claim existing to said land adverse to his own, and if the applicant be a

---

[1] This reference was no doubt to the act of September 4, 1841, 5 Stat. 453, c. 16, by which Congress granted to each of certain States named, and to each new State, as it was admitted into the Union, five hundred thousand acres of land for purposes of internal improvement, " the selections in all of said States to be made within their limits respectively in such manner as the legislatures thereof shall direct," § 8; and to the act of the California legislature of May 3, 1852, which authorized the issue of land warrants to be sold and the proceeds invested in bonds to be kept as a special deposit to the credit of the " school fund," and which act also provided that " the parties purchasing such warrants and their assigns are hereby authorized in behalf of this State to locate the same upon any vacant and unappropriated land belonging to the United States within the State of California subject to such location," etc. — *Laws of California*, 1852, p. 41, c. 4.

female, that she is entitled to purchase and hold real estate in her own name under the laws of this State; all of which shall be verified by the affidavit of three disinterested witnesses."

By another section (§ 5) it is provided : " Whenever a settlement is or has been made by occupation or improvement upon any portion of a sixteenth or thirty-sixth section of any of the public lands in this State, the locating agent of the district in which such land is situated shall, if such occupant has not acquired a preëmption right to such land, notify such occupant or claimant of the fact that he is upon lands belonging to the State, and that he must make application to purchase the same of the State within sixty days, or forfeit all rights to the land. If such occupant or claimant shall neglect or refuse to make such application to purchase within the sixty days above named, such land shall be subject to location and sale in the manner provided for the sale of other sixteenth and thirty-sixth sections, with the exception that the affidavits in regard to occupancy and improvement may be omitted, in all of which cases the application to purchase shall be accompanied by the affidavit of the locating agent of the district, that he has duly notified the occupant or claimant of the land as provided by this section, and that for a period of sixty days after such notice the occupant or claimant has refused or neglected to apply for said lands."

We have seen that before the passage of this act of Congress, namely, on the 13th day of June, 1864, Hirleman made application in proper form to the State, under the act of April 27, 1863, " to locate as a lieu school land location and to purchase from said State, the said 240 acres of land involved in this action." That application and offer to purchase were accepted by the State's agent on the 16th of June, 1864, upon the condition that if the location was made and was approved by the United States it should be for the use of the applicant upon his complying with the conditions of the act of April 27, 1863. The location was made by the State's locating agent on the 28th day of February, 1865, by filing an application in its name in the land office at San Francisco. The

application was approved by the surveyor general of California on May 13, 1865. And on August 1, 1865, Hirleman, having made payment as required, a certificate of purchase covering the lands was given to him by the State. These things all took place before the railroad company filed its map of definite location, and before the passage of the act to be presently referred to quieting land titles in California.

As Congress expressly declared that neither the act of 1864 nor that of 1862 should defeat or impair "any preëmption, homestead, swamp land or other lawful claim," the controlling question in the case is whether, within the meaning of that act, Hirleman's claim ever became a "lawful claim" upon these lands? In determining this question, the words in the act of 1862, "not sold, reserved or otherwise disposed of by the United States . . . at the time the line of said road is definitely fixed," must be taken in connection with the words in the amendatory act of July 2, 1864, "shall not defeat or impair any . . . other lawful claim." Construing those acts together it is clear that no lands were embraced by the grant to which any "lawful claim" had attached *at the time the line of railroad was definitely fixed* on the 20th day of February, 1870. By the express terms of the granting act, as we have seen, only odd-numbered sections were granted which, at the date of the definite location of the road, were *not* sold, reserved *or otherwise disposed of* by the United States, and to which no preëmption, homestead or other lawful claim had attached. *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629, 639, 644.

What, then, was the situation at the time of the definite location of the road?

By the act of Congress of July 23, 1866, 14 Stat. 218, c. 219, entitled "An act to quiet land titles in California," it was provided (§ 1) that "in all cases where the State of California has heretofore made selections of any portion of the public domain in part satisfaction of any grant made to said State by any act of Congress, and has disposed of the same to purchasers in good faith under her laws, the lands so selected shall be, and hereby are, confirmed to said State: *Provided*,

That no selection made by said State contrary to existing
laws shall be confirmed by this act for lands to which any
adverse preëmption, homestead or other right has, at the
date of the passage of this act, been acquired by any settler
under the laws of the United States, or to any lands which
have been reserved for naval, military or Indian purposes by
the United States, or to any mineral land, or to any land held
or claimed under any valid Mexican or Spanish grant, or to
any land which, at the time of the passage of this act, was
included within the limits of any city, town or village, or
within the county of San Francisco: *And provided further*,
That the State of California shall not receive under this act a
greater quantity of land for school or improvement purposes
than she is entitled to by law." The second section related
to selected lands that had been surveyed by authority of the
United States; the third section to selected lands that had
not been surveyed by authority of the United States, but
which had been surveyed by authority of and under the laws
of the State, and sold to purchasers in good faith under the
laws of the State.

This act was passed several years before the railroad com-
pany filed its map of definite location. Its object is manifest
upon its face. It was a statute of repose in respect of land
titles in California. Referring to the provisions of the act of
March 3, 1853, 10 Stat. 244, 246, c. 145, requiring surveys of
the public lands as a means of extending to California the
system of surveys, sales and preëmptions provided for other
States and Territories, this court, speaking by Mr. Justice
Miller, in *Huff* v. *Doyle*, 93 U. S. 558, 559, said: "The State
of California, impatient of the delay of the United States
authorities in making these surveys, undertook to perform
that duty herself; and, assuming from data furnished by her
own surveys, that a great many acres of the sixteenth and
thirty-sixth sections were within one or the other of the
exceptions of the granting clause, for which the State was to
select other lands, the legislature authorized selections and
locations to be made in lieu thereof, according to state surveys.
The land in controversy was so selected by the State and sold

to the plaintiff, who settled on it in 1865, and received from the State a certificate of sale. The officers of the Land Department, when the matter was brought to their attention, refused to recognize the surveys made by the State, or to acknowledge the validity of selections and locations made under the state laws; and as many such selections and actual settlements under them had been made, the hardships and embarrassments growing out of the action of the state government caused the passage of the act of July 23, 1866." In *Rowe's case*, the Land Department said: "The act of July 23, 1866, is remedial in its character and should be construed liberally. It is entitled an act to quiet land titles in California, and was evidently intended by Congress to be curative of irregularities in selections made by the State under various grants, and to confirm titles in innocent purchasers from the State notwithstanding irregularities in selections." 7 L. D. 397, 399.

While guarding the rights of settlers "under the laws of the United States," and taking care to exclude from its provisions all lands previously reserved for naval, military or Indian purposes by the Government; mineral lands; lands held or claimed under valid Mexican or Spanish grants; and lands which at the time were within any city, town or village, or within the county of San Francisco; Congress intended that justice should be done to those who in good faith had purchased from the State, under its laws, lands which the State had selected from the public domain in part satisfaction of grants by Congress. In accomplishing that result, it used in the act of 1866 language that clearly covered all cases of that character. No case of that kind was excepted from the operation of the act. The present case belongs to that class. The lands in controversy were selected by the State in part satisfaction of a grant to it of public lands. And they were disposed of by the State to a purchaser in good faith under its laws. All this occurred, as we have seen, before the passage of the act of 1866; for Hirleman, under whom Menotti claims, received from the State, on the 1st day of August, 1865, a certificate of purchase. And Menotti made application to the Land Department, under the act of

July 23, 1866, for the confirmation of the right of the State to the land so selected by it for his benefit; and *upon due notice to the Western Pacific Railroad Company and the parties claiming under it,* such proceedings were had in that department, such proofs submitted, and such hearing had, that on the 15th day of May, 1874, the Commissioner of the General Land Office, under the direction and with the approval of the Secretary of the Interior, listed over and certified to the State the 240 acres of land "as confirmed to said State of California."    Thereupon Menotti, as assignee of Hirleman, on the 31st day of December, 1874, made full payment upon such location to the State, and on the 25th day of February, 1875, the State issued to him its letters patent, based upon the original application in 1864 for the lands in question.

In *Wilkinson* v. *Merrill,* 52 California, 424, 426, the Supreme Court of California said: "Under the act of Congress of July 23, 1866, it was a question for the Land Department — first, whether the State had selected the land in controversy in part satisfaction of any grant made to the State by any act of Congress; second, whether the State had disposed of the land to a purchaser in good faith under her laws; third, whether the land was within any of the exceptions by which lands are reserved from the validating effect of the act; fourth, whether the defendant had proved up his claim before the register and receiver in the manner and within the time required by the validating act.    These were questions in which no one but the United States and the defendant were interested; and the act of Congress confers upon the Land Department the jurisdiction to determine them.    On deciding these questions in favor of the applicant claiming as a purchaser from the State, it is made the duty of the Commissioner of the General Land Office to certify the lands over to the State for the benefit of the purchaser.    The case shows that the selection by the State for the use of the defendant was approved by the Commissioner of the General Land Office and by the Secretary of the Interior after proper investigation, and thereupon the land was duly listed to the

State. Up to this point the rights of no third person had intervened, and the Land Department, to whom the decision of all the questions of law and fact pertaining to the proceeding were specially confided, having decided in favor of their regularity and validity, the decision was conclusive as against the United States, and is conclusive as against the plaintiff, who subsequently attempted to acquire the title from the State." In *Huff* v. *Doyle*, above cited, this court said that it admitted of grave doubt whether in a suit at law the validity of the action of the Land Department confirming lands to the State under the act of 1866 could be impeached, and that it certainly could not be impeached on any other ground disclosed by the record of that case than that it confirmed lands to the State which were expressly excepted from confirmation. We are of opinion that while the decision of the Land Department was conclusive as to all facts upon which it necessarily rested, it was not conclusive as to the question of law involved in it, namely, whether the act of 1866 confirmed to the State any lands which, at the time, were withdrawn by executive order from "preëmption, private entry and sale" for the benefit of the railroad company.

It is said that the railroad company filed its map of general route on the 8th day of December, 1864, and that these lands having been withdrawn from preëmption, private entry and sale by the executive order of January 30, 1865, they were not embraced by the act of 1866. In our opinion this is not a proper interpretation of that act. The proviso of the first section distinctly indicates certain cases to which the act should not apply; and, distinctly excluding those cases, but no others, from its operation, the act, in express words, confirmed to the State, "in all cases," lands which the State had theretofore selected in satisfaction of any grant by Congress and sold to purchasers in good faith under its laws. No exception is made of lands which, at the date of the passage of the act, were withdrawn from preëmption, private entry and sale pursuant to the filing by the railroad company of its map of *general* route. And the court should not construe the act as excluding lands in that condition, unless it is prepared to

hold that Congress had no power to confirm to the State lands which, at the time, were simply withdrawn from preemption, private entry or sale for railroad purposes. We cannot so adjudge. The withdrawal order of January 30, 1865, did not, in our judgment, stand in the way of the passage of such an act as that of 1866; first, because the acts of 1862 and 1864 by necessary implication recognized the right of Congress to dispose of the odd-numbered sections, or any of them, within certain limits on each side of the road, at any time prior to the definite location of the line of the railroad; second, Congress reserved the power to alter, amend or repeal each act; third, the filing of the map of general route gave the railroad company no claim to any specific lands within the exterior limits of such route on either side of the road, the rule being that a grant of public lands, in aid of the construction of a railroad, is, until its route is established, in the nature of "a float," and title does not attach to specific sections until they are identified by an accepted map of definite location of the line of road to be constructed. The railroad company accepted the grant subject to the possibility that Congress might, in its discretion, and prior to the definite location of its line, sell, reserve or dispose of enumerated sections for other purposes than those originally contemplated. *Kansas Pacific Railway* v. *Dunmeyer,* 113 U. S. 629, 639, 644; *United States* v. *Southern Pacific Railroad,* 146 U. S. 570, 593. In *Northern Pacific Railroad* v. *Sanders,* 166 U. S. 620, 634, we said: "The company acquired, by fixing its general route, only an inchoate right to the odd-numbered sections granted by Congress, and no right attached to any specific section until the road was definitely located, and the map thereof filed and accepted. Until such definite location it was competent for Congress to dispose of the public lands on the general route of the road as it saw proper."

It is true, as said in many cases, that the object of an executive order withdrawing from preemption, private entry and sale, lands within the general route of a railroad is to preserve the lands, unencumbered, until the completion and acceptance of the road. But where the grant was, as here, of odd-

numbered sections, within certain exterior lines, "*not* sold, reserved or otherwise disposed of by the United States, and to which a preëmption or homestead claim may not have attached, at the time the line of said road is definitely fixed," the filing of a map of general route and the issuing of a withdrawal order did not prevent the United States, by legislation, at any time prior to the definite location of the road, from selling, reserving or otherwise disposing of any of the lands which, but for such legislation, would have become, in virtue of such definite location, the property of the railroad company. Especially must this be true, where the grant is made subject to the reserved power of Congress to add to, alter, amend or repeal the act containing such grant. The act of 1866 did not take from the railroad company any lands to which it had then acquired an absolute right. The right it acquired, in virtue of the act making the grant and of the accepted map of its general route, was to earn such of the lands, within the exterior lines of that route, as were *not* sold, reserved or disposed of, or to which no preëmption or homestead claim had attached, at the time of the definite location of its road. That act did not violate any contract between the United States and the railroad company, for the reason that the contract itself recognized the right of Congress at any time before the line of road was definitely located, to dispose of odd-numbered sections granted. It was one that disposed of the lands in question before the definite location of the road. It dedicated these and like lands, part of the public domain, to the specific purposes stated in its provisions, and to that extent removed the restrictions created by the withdrawal order of 1865, leaving that order in full force as to other lands embraced by it. *Bullard* v. *Des Moines & Fort Dodge Railroad,* 122 U. S. 167, 174. That order took these lands out of the public domain as between the railroad company and individuals, but they remained public lands under the full control of Congress, to be disposed of by it in its discretion at any time before they became the property of the company under an accepted definite location of its road.

We cannot doubt that the act of 1866 was a legal exertion

of the power of Congress over the public domain; and as its provisions embraced the present case, it must be adjudged that, at the date of the definite location of the line of the railroad referred to, there was a "lawful claim" upon the lands in controversy, based on the act of 1866; in other words, that act confirmed to the State, for the benefit of those who had purchased from it in good faith, all lands embraced by its provisions, and not expressly excepted therefrom. The subsequent definite location of the line of the railroad did not withdraw from its operation any lands confirmed to the State. This doubtless was the view taken by the Land Department, which, after due notice to all parties interested, confirmed these lands to the State. The circumstance that the railroad company had, before that action of the Land Department, obtained a patent covering these with other lands, is not material, for the reason that they had been segregated from the public domain by the act of 1866, and were thereby excluded from the grant of 1862, notwithstanding they were within the exterior lines of the general route of the railroad. Besides, Menotti's proceedings under the act of 1866 were instituted in that department before the railroad company obtained its patent.

Without considering other aspects of the case, we are of opinion that the defendant was entitled, upon the findings of fact, to a judgment in his favor. A judgment in favor of the plaintiffs was a denial of rights secured to the defendant by the laws of the United States.

As the views we have expressed determine the case for the plaintiff in error, it is unnecessary to consider whether, as held by the Supreme Court of the State, the words in the fourth section of the printed act of July 2, 1864, 13 Stat. 356, c. 216, "the improvements of any *bona fide* settler, *or* any lands returned and denominated as mineral lands," should read "the improvements of any *bona fide* settler *on* any lands returned and denominated as mineral lands."

*The judgment is reversed, and the case remanded to the Supreme Court of California for further proceedings not inconsistent with this opinion.*