## SOUTHERN PAC. R. CO. v. AMBLER GRAIN & MILLING CO.

### No. 6953.

Circuit Court of Appeals, Ninth Circuit.

July 27, 1933.

Rehearing Denied Sept. 6, 1933.

671

Frank Thunen, of San Francisco, Cal., for appellant.

Arch. H. Vernon, of Los Angeles, Cal., for appellee.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

SAWTELLE, Circuit Judge.

An action was brought by the appellant against the appellee to remove a cloud on the appellant's title to a strip of land in Los Angeles county, Cal., claimed by the appellant to be part of the 200-foot right of way granted to it by an act of Congress approved March 3, 1871 (16 Stat. 573).

It is admitted that William M. Tileston, predecessor in interest of the appellee, filed a homestead entry upon the subdivision embracing the strip in controversy on August 5, 1870, improved and cultivated the land and resided upon it, and on May 6, 1871, commuted his claim to a cash entry, upon which a patent to Tileston was issued on November 10, 1874.

The cause was submitted upon a stipulation of facts and upon briefs of counsel. The court below entered a judgment declaring the appellee to be the owner in fee simple of the strip in question, and decreeing that the appellant had no right or title therein. From that judgment was taken the present appeal.

The appellant challenges the adverse conclusion of the court below upon two grounds:

(1) The inchoate right of the homestead entryman did not withdraw the land from the operation of the right of way grant, even though it did withdraw it from the adverse entry under the general land laws.

(2) Whatever the effect of the homestead entry as a withdrawal from the public domain, the fee was in the government on March 3, 1871, and passed by the grant. The commutation from homestead to cash entry on May 6, 1871, was in law an abandonment of the homestead claim and the initiation of a new right, subject to the intervening right of way grant of March 3, 1871.

We turn first to the Act of March 3, 1871, by the terms of which the rights of the appellant to the strip in controversy are to be partly, but not entirely, measured.

Section 23 of the Act, at 16 Stat. 579, reads as follows: "That, for the purpose of connecting the Texas Pacific railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa [sic] Pass, by way of Los Angeles, to the Texas Pacific railroad at or near the Colorado river, with the same rights, grants, and privileges, and subject to the same limitations, restrictions, and conditions as were granted to said Southern Pacific Railroad Company of California, by the act of July twenty-seven, eighteen hundred and sixty-six: *Provided, however,* That this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or any other railroad company."

It next becomes necessary to examine the Act of July 27, 1866, referred to in the foregoing section. Section 18 of that act provides as follows: "* * * That the Southern Pacific Railroad, * * * is hereby authorized to connect with the said Atlantic and Pacific Railroad, formed under this act, at such point, near the boundary line of the State of California, as they shall deem most suitable for a railroad line to San Francisco, and shall have a uniform gauge and rate of freight or fare with said road; and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific Railroad herein provided for." 14 Stat. 299.

Section 2 of the same act provides: "Sec. 2. *And be it further enacted,* That the right of way through the public lands be, and the same is hereby, granted to the said Atlantic and Pacific Railroad Company, its successors and assigns, for the construction of a railroad and telegraph as proposed; and the right, power, and authority is hereby given to said corporation to take from the public lands adjacent to the line of said road material of earth, stone, timber, and so forth, for the construction thereof. Said way is granted to said railroad to the extent of one hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary grounds for station-buildings, workshops, depots, machine-shops, switches, side-tracks, turn-tables, and water-stations; and the right of way shall be exempt from taxation within the Territories of the United States. The United States shall extinguish, as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act and acquired in the donation to the road named in the act."

Finally, in searching the act of 1866 for the conditions and limitations therein provided, we find the following reservations contained in section 3 of the act: " * * * That there be, and hereby is, granted to the Atlantic and Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway and its branches, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is designated by a plat thereof, filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections, and not including the reserved numbers. * * *"

■■■ The pivotal question in the present controversy is whether or not the filing of an "inchoate" homestead entry upon public land so withdraws the land embraced by such entry that it is no longer part of the public domain, and is not included in a subsequent grant of a right of way to a railroad that, but for such homestead entry, would embrace such land.

An unbroken line of Supreme Court decisions leads us irresistibly to an affirmative answer to the above proposition.

The leading case on the subject is Kansas Pacific Railway Co. v. Dunmeyer, 113 U. S. 629, 641, 642, 644, 5 S. Ct. 566, 567, 28 L. Ed. 1122. That case was a suit for breach of covenant of warranty of title to a tract of land in Kansas. The railroad's title was derived from grants of public land under various statutes. The tract in controversy was within the location of the railroad grants, but

was excepted from those grants by reason of a homestead entry and possession. Subsequently to this entry and possession, the party so in possession took the title from the railroad company, and the homestead entry was canceled. The alleged paramount adverse title was derived from a patent from the United States, issued on a homestead entry made subsequently to those proceedings. The Supreme Court of Kansas found that there was a breach of the warranty, and rendered judgment accordingly.

The land was sold by the railroad to George W. Miller, to whom a certificate of sale was given, which afterwards came by assignments to Lewis Dunmeyer, to whom the railroad made a deed purporting to convey a good title. On that covenant for good title Dunmeyer brought his action, alleging that the railroad never had any title, and that the covenant was therefore broken.

The Supreme Court of the United States regarded the railroad's title to the land at the time it made the conveyance to Dunmeyer as being perfect, "unless it came within some of the exceptions contained in the language of the grant." The Supreme Court of Kansas based its decision on the ground that the tract did come within the language of such an exception. That language was as follows: " * * * That there be, and is hereby, granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached, at the time the line of said road is definitely fixed." 12 Stat. 492, § 3.

The record showed that on July 25, 1866, Miller made a homestead entry on the land that was in every respect valid, if the land was then public land subject to such entry. The line of definite location of the railroad was first filed with the Commissioner of the General Land Office at Washington on September 21, 1866. The Supreme Court held that this entry of Miller's brought the land within the language of the exception in the grant as land to which a homestead claim had attached at the time the line of the road was definitely fixed.

Miller entered upon the land within the time prescribed by law, erected a house upon it, and brought his family to live there, and made the tract his home until the spring of 1870. He afterward abandoned his homestead claim and bought the land of the railroad company, and paid for it. He then sold the land and transferred the certificate of sale to Dunmeyer, who obtained the conveyance from the company. After all this, Miller's homestead entry was canceled, no doubt with Dunmeyer's consent, and G. B. Dunmeyer made a homestead entry which the land department held to be valid.

Miller's homestead entry was made *after* the passage of the statutes granting the land to the railroad as an aid in construction, but, as we have seen, *before* the line of the road was definitely fixed.

It was argued by the railroad that, although Miller's homestead entry had attached to the land, within the meaning of the excepting clause of the grant, before the line of definite location was filed by it, yet when Miller abandoned his claim, so that it no longer existed, the exception no longer operated, and the land reverted to the company—that the grant by its inherent force reasserted itself and extended to or covered the land as though it had never been within the exception.

Of this contention, Mr. Justice Miller said:

"No attempt has ever been made to include lands reserved to the United States, which reservation afterwards ceased to exist, within the grant, though this road, and others with grants in similar language, have more than once passed through military reservations for forts and other purposes, which have been given up or abandoned as such reservations, and were of great value. Nor is it understood that, in any case where lands had been otherwise disposed of, their reversion to the government brought them within the grant.

"Why should a different construction apply to lands to which a homestead or pre-emption right had attached? Did congress intend to say that the right of the company also attaches, and whichever proved to be the better right obtained the land?

"The company had no absolute right until the road was built, or that part of it which came through the land in question. The homestead man had five years of residence and cultivation to perform before his right became absolute. The pre-emptor had similar duties to perform in regard to cultivation, residence, etc., for a shorter period, and then payment of the price of the land. It is not conceivable that congress intended to place these parties as contestants for the land, with the right in each to require proof from the other of complete performance of its obligation. Least of all is it to be supposed that it was intended to raise up, in antagonism to all the actual settlers on the soil, whom it had invited to its occupation, this great corporation, with an interest to defeat their claims, and to come between them and the government as to the performance of their obligations.

"The reasonable purpose of the government undoubtedly is that which it expressed, namely, while we are giving liberally to the railroad company, we do not give any lands we have already sold, or to which, according to our laws, we have permitted a pre-emption or homestead right to attach. No right to such land passes by this grant. No interest in the railroad company attaches to this land or is to be founded on this statute. Such is the clear and necessary meaning of the words that there is granted every alternate section of odd numbers to which these rights have not attached. It necessarily means that, if such rights have attached, they are not granted.
* * *

"In the case before us a claim was made and filed in the land-office, and there recognized, before the line of the company's road was located. That claim was an existing one of public record in favor of Miller when the map of plaintiff in error was filed. In the language of the act of congress this homestead claim had *attached* to the land, and it therefore did not pass by the grant.

"Of all the words in the English language, this word '*attached*' was probably the best that could have been used. It did not mean mere settlement, residence, or cultivation of the land, but it meant a proceeding in the proper land-office, by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation. With the performance of these conditions the company had nothing to do. The right of the homestead having attached to the land, it was excepted out of the grant as much as if, in a deed, it had been excluded from the conveyance by metes and bounds."

The Dunmeyer decision has been quoted or cited with approval by the Supreme Court too often to leave any doubt in our mind that it is still the law of the land. In Hastings & Dakota Railroad Co. v. Whitney, 132 U. S.

357, 361, 366, 10 S. Ct. 112, 114, 33 L. Ed. 363; the court said:

"In the light of these decisions, the almost uniform practice of the department has been to regard land, upon which an entry of record valid upon its face has been made, as appropriated and withdrawn from subsequent homestead entry, pre-emption settlement, sale, or grant until the original entry be canceled or declared forfeited; in which case the land reverts to the government as a part of the public domain, and becomes again subject to entry under the land laws. The correctness of this holding has been sustained by this court in the case of Kansas Pacific Railway v. Dunmeyer. * * *

"For the foregoing reasons we concur with the court below that Turner's homestead entry excepted the land from the operation of the railroad grant; *and that upon the cancellation of that entry the tract in question did not inure to the benefit of the company, but reverted to the government, and became a part of the public domain,* subject to appropriation by the first legal applicant. * * *" (Italics our own).

In Shiver v. United States, 159 U. S. 491, 494, 16 S. Ct. 54, 55, 40 L. Ed. 231, the court thus concisely summarized the doctrine of the Dunmeyer Case, which we are following here: "Indeed, this court has settled by repeated decisions that the claim of a homestead or pre-emption entry, made at any time before filing a map of definite location of a railway, prevents the lands covered by such claim from passing to such railway under its land grant, *even though such entry be subsequently abandoned."* (Italics our own.)

The soundness of the decision in the Dunmeyer Case has never been questioned, though in a few instances cases have been distinguished on the facts. The correctness of the doctrine has been repeatedly recognized.[1]

[1] See Doolan v. Carr, 125 U. S. 618, 625, 8 S. Ct. 1228, 31 L. Ed. 844; United States v. Missouri, etc. R. Co., 141 U. S. 358, 369, 12 S. Ct. 13, 35 L. Ed. 766; Sioux City, etc., Land Co. v. Griffey, 143 U. S. 32, 40, 12 S. Ct. 362, 36 L. Ed. 64; New Orleans Pacific R. Co. v. Parker, 143 U. S. 42, 57, 12 S. Ct. 364, 36 L. Ed. 66; Bardon v. Northern Pacific R. Co., 145 U. S. 535, 544, 12 S. Ct. 856, 36 L. Ed. 806; U. S. v. Southern Pacific R. Co., 146 U. S. 570, 604, 13 S. Ct. 152, 36 L. Ed. 1091; Monroe Cattle Co. v. Becker, 147 U. S. 47, 57, 13 S. Ct. 217, 37 L. Ed. 72; Noble v. Union River Logging R. Co., 147 U. S. 165-174, 13 S. Ct. 271, 37 L. Ed. 123; Whitney v. Taylor, 158 U. S. 85, 89, 92, 93, 15 S. Ct. 796, 39 L. Ed. 906; Weeks v. Bridgman, 159 U. S. 541, 545, 546, 16 S. Ct. 72, 40 L. Ed. 253; Northern Pacific R. Co. v. Colburn, 164 U. S. 383-386, 17 S. Ct. 98, 41 L. Ed. 479; United States v. Winona, etc., R. Co., 165 U. S. 463, 475, 17 S. Ct. 368, 41 L. Ed. 789; Northern Pacific R. Co. v. Sanders, 166 U. S. 620, 630, 631, 17 S. Ct. 671, 41 L. Ed. 1139; Menotti v. Dillon, 167 U. S. 703-715, 17 S. Ct.

In Union Pacific R. Co. v. Harris, 215 U. S. 386, 388, 389, 30 S. Ct. 138, 139, 54 L. Ed. 246, the Supreme Court said: "The grant of the right of way was 'through the public lands.' What is meant by 'public lands' is well settled. As stated in Newhall v. Sanger, 92 U. S. 761, 763, 23 L. Ed. 769, 770: 'The words "public lands" are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws.' See also Barker v. Harvey, 181 U. S. 481-490, 21 S. Ct. 690, 45 L. Ed. 963-968; Minnesota v. Hitchcock, 185 U. S. 373-391, 22 S. Ct. 650, 46 L. Ed. 954-964. If it is claimed in any given case that they are used in a different meaning, it should be apparent either from the context or from the circumstances attending the legislation. While the power of Congress over lands which an individual is seeking to acquire under either the pre-emption or the homestead law remains until the payment of the full purchase price required by the former law or the full occupation prescribed by the latter, yet, under the general land laws of the United States, one who, having made an entry, is in actual occupation under the pre-emption or homestead law, cannot be dispossessed of his priority at the instance of any individual. Hastings, etc., Railroad Co. v. Whitney, 132 U. S. 357, 363, 364, 10 S. Ct. 112, 33 L. Ed. 363, 366, 367. In other words, one who has taken land under the pre-emption or homestead law acquires an equity of which he cannot be deprived by any individual under the like laws. Now, at the time of the passage of the act of July 3, 1866, Blou was and had been, for several months, in actual occupation under the homestead law. Did Congress intend by its legislation to deprive him of that equity which he had under the general land laws as against anyone proceeding under those laws?"

Later on in the opinion there is a quotation from Washington & Idaho Railroad Company v. Osborn, 160 U. S. 103, 16 S. Ct. 219, 40 L. Ed. 356 (on page 391 [of 215 U. S., 30 S. Ct. 138, 140] of the Harris opinion) as follows: " 'On the other hand, it would not be easy to suppose that Congress would, in

945, 42 L. Ed. 333; Northern Pacific R. Co. v. De-Lacey, 174 U. S. 622, 635, 19 S. Ct. 791, 43 L. Ed. 1111; Tarpey v. Madsen, 178 U. S. 215, 223, 224, 20 S. Ct. 849, 44 L. Ed. 1042; Oregon, etc., R. Co. v. U. S., No. 3, 190 U. S. 186-190, 23 S. Ct. 673, 47 L. Ed. 1012; McMichael v. Murphy, 197 U. S. 304, 311, 25 S. Ct. 460, 49 L. Ed. 766; Southern Pacific R. Co. v. U. S. (No. 2), 200 U. S. 354-350, 26 S. Ct. 298, 50 L. Ed. 512; Northern Lumber Co. v. O'Brien, 204 U. S. 190-197, 27 S. Ct. 249, 51 L. Ed. 438; Krueger v. U. S., 246 U. S. 69, 75, 38 S. Ct. 262, 62 L. Ed. 582; Great Northern R. Co. v. Steinke, 261 U. S. 119, 127, 43 S. Ct. 316, 67 L. Ed. 564; Great Northern R. Co. v. Reed, 270 U. S. 539-549, 46 S. Ct. 380, 70 L. Ed. 721.

authorizing railroad companies to traverse the public lands, intend thereby to give them a right to run the lines of their roads at pleasure, regardless of the rights of settlers.' "

The Harris Case, though involving somewhat different facts, is in point in the instant controversy to the extent that there, as here, the homesteader changed his entry from one form to the other. His procedure, however, was the converse of the one followed by the appellee. Blou, the entryman in the Harris Case, changed his pre-emption entry to one under the homestead act. In both the instant case and the Harris Case, the alleged abandonment was, at best, a *legal fiction*, because in each case the entryman actually received a patent under his new entry. There was not the *actual* abandonment that was present in some of the later cases, where, nevertheless, the principle we are here sustaining was recognized.

The appellant seeks to minimize the authority of the former, asserting that it has been "explained away" in subsequent decisions. We cannot concur in this view. The authority òf the Harris Case, in so far as it expounds the law of the entryman's rights to public land, has not been assailed. The Harris Case more than once has been cited with approval by the Supreme Court of the United States. See, Missouri, etc., Railway Co. v. United States, 235 U. S. 37, 40, 35 S. Ct. 6, 59 L. Ed. 116, and Ash Sheep Co. v. United States, 252 U. S. 159, 166, 40 S. Ct. 241, 64 L. Ed. 507.

The appellant relies heavily upon the case of the Great Northern R. Co. v. Steinke, supra. But it should be borne in mind that in the Steinke Case the court was construing the Act of March 3, 1875 (43 USCA §§ 934–939), which contained no such exception in favor of prior homestead rights as is found in the act of 1866, discussed above. On page 124 (of 261 U. S., 43 S. Ct. 316, 318) of the Steinke decision the Supreme Court recognizes the distinctive wording of the act of 1875, in the following language: "Its purpose was to enhance the value and hasten the settlement of the public lands by inviting and encouraging the construction and operation of needed and convenient lines of railroad through them. Nothing was granted for private use or disposal, nor beyond what Congress deemed reasonably essential, presently or prospectively, for the quasi public uses indicated. Because of this, the act has been regarded as requiring a more liberal construction than is accorded to private grants or to

the extensive land grants formerly made to some of the railroads."

And, even more specifically, the court distinguished the Steinke Case from the Dunmeyer Case, at page 127 (of 261 U. S., 43 S. Ct. 316, 319) of the Steinke opinion: "Unlike the land grants considered in cases like Kansas Pacific Ry. Co. v. Dunmeyer, * * * and Hastings & Dakota R. R. Co. v. Whitney, * * * the act of 1875 contains no provision whereby lands covered by homestead or similar claims when the grant attaches are excluded from it. On the contrary, a survey of all that the act does contain shows that the grant is intended to include lands of that class, but with the qualification, plainly implied in the third section, that due compensation must be made to the claimants for their inchoate or possessory rights to make the grant operative against them."

Accordingly, we believe that the court below was correct in holding that the appellee is the owner in fee simple of the tract in question, and that the appellant has no right or title thereto. The judgment is therefore affirmed.

Judgment affirmed.

WILBUR, Circuit Judge (concurring).

I concur in the judgment of affirmance. I am not prepared to concur in the conclusion that lands in the right of way grant made by section 2 of the Act of 1866 quoted in the main opinion are reserved from the grant, as is the case of lands granted by section 3 of the act where such lands have been properly entered as a homestead. There seems to be no direct decision upon that question, and appellant confesses that it has been unable to find one. There are many reasons for holding that the interest of the United States therein was granted in præsenti by the right of way grant. If it is held otherwise, as in the case of lands granted in aid of the railroad company under section 3, then, as held in the main opinion, upon the relinquishment or abandonment of the claim by the entryman, title would revert to the government and the railroad company would have no right under the original grant to build across such lands without additional legislation. In the meantime other rights might intervene to prevent Congress from granting such right. Under the Act of March 3, 1875 (43 USCA §§ 934–939), it is definitely held by the Supreme Court that the right of the government to the lands covered by the right of way passes to the railroad company subject to a duty on its part to compensate

those who have obtained equitable interests therein (Great Northern R. Co. v. Steinke, 261 U. S. 119, 43 S. Ct. 316, 67 L. Ed. 564), and that consequently upon abandonment of the entryman's right, the qualification of the grant in favor of the entryman disappears and the title is perfected in the railroad without qualification. It is true that this conclusion is reached by reason of the fact that the act of 1875, supra, specifically provides for the condemnation of the rights of the entryman, and this consideration from which it is clear that the right of way covers lands that have been previously entered and occupied. The question in the case at bar is whether a similar grant of a right of way over "the public domain" (section 2, act of 1866, supra), instead of over the "public lands," as in the act of 1875, supra, shall receive a narrower construction than the act of 1875, although the grant in the act of 1866 is unqualified by the requirement of compensation to the entryman. In other words, does the requirement of such compensation in the act of 1875 extend the scope of the grant over that of 1866, which contains no such requirement. This anomalous result must be arrived at, if at all, I think, by a consideration of the meaning of the phrase, "public domain," used by Congress in section 2 of the act of 1866, and not by analogy from decisions relating to the aid land grant contained in section 3 of the act of 1866 which expressly reserves from the operation of the grant lands already homesteaded, or pre-empted, etc. In the latter case, as stated in the main opinion, it is thoroughly established that lands subject to such rights are reserved from the grant and did not pass at the time of the enactment by Congress nor later upon abandonment by the entryman of his rights. Kansas Pac. R. Co. v. Dunmeyer, 113 U. S. 629, 5 S. Ct. 566, 28 L. Ed. 1122, supra. Now, it is true that the phrase "public lands," used without modification or qualification, is usually held to include only lands "such as are subject to sale or other disposal under general laws." Union Pac. R. Co. v. Harris, 215 U. S. 386, 30 S. Ct. 138, 139, 54 L. Ed. 246; Leavenworth, L. & S. R. Co. v. U. S., 92 U. S. 733, 23 L. Ed. 634; Bardon v. Northern Pac. R. Co., 145 U. S. 535, 12 S. Ct. 856, 36 L. Ed. 806. Consequently, it was held by the Supreme Court that the grant to the predecessor of the Union Pacific Railway Company by the Act of July 3, 1866 (14 Stat. 79, c. 159), supplementing earlier acts (12 Stat. 489, 494; 13 Stat. 356) of a right of way, did not include a right of way over land which was occupied by a pre-emption entryman at the time the first act of Congress was

passed in 1862, where the entry had been changed to a homestead entry before the act became effective July 3, 1866. That conclusion was based upon an act granting a 200-foot right of way to the Leavenworth, Pawnee & Western Ry. Co., under the Union Pacific Railroad Act passed July 1, 1862 (12 Stat. 489, 494), as amended July 2, 1864 (13 Stat. 356, c. 216), which amendment, among other things, required condemnation of a 200-foot right of way through land occupied by an owner or claimant. The homestead entryman subsequently perfected his title by patent to the 150-foot strip in controversy and conveyed to the railroad company 50 feet for a right of way. This decision, in result, at least, is similar to the later decision of the Supreme Court in Great Northern R. Co. v. Steinke, supra, both decisions dealing with a grant which contained a requirement that private rights in the public land covered by the right of way be condemned. Where the entryman had perfected his title by patent, and there had been no condemnation of his rights, the title resided in him.

Under the act of 1875, supra, the Supreme Court has held that a "possessory right" upon unsurveyed government lands anticipating a pre-emption thereof as soon as surveyed was such a right as could be secured by the railroad company for its use as a right of way only by condemnation (Washington & I. R. Co. v. Osborn, 160 U. S. 103, 16 S. Ct. 219, 221, 40 L. Ed. 356, citing Buxton v. Traver, 130 U. S. 235, 9 S. Ct. 509, 32 L. Ed. 920), for a definition of such possessory rights and stating, "It must therefore be conceded that Osborn did not, by maintaining possession for several years, and putting valuable improvements thereon, preclude the government from dealing with the lands as its own, and from conferring them on another party by a subsequent grant," adding by way of qualification the phrase quoted therefrom in the main opinion, supra. This court, however, as late as 1926, has expressly held that the right of way grant to the Southern Pacific Railroad Company by the Act of March 3, 1871 (16 Stat. 573), was a grant in præsenti and took precedence over such possessory rights in unsurveyed land which had been subsequently conveyed to one who made the necessary declaratory statement and procured a patent from the government. Barnes v. Southern Pac. Co., consolidated with Mulvihill v. Southern Pacific Co. (C. C. A.) 16 F.(2d) 100. If, then, we follow our decision in Barnes v. Southern Pacific Co., supra, it is clear that the grant of the right of way under the act of 1871, § 2, supra, vests the grant in the railroad com-

pany regardless of possessory rights upon unsurveyed land without compensation to the possessor. Does it also vest title to surveyed public lands which have been duly entered as a homestead or pre-emption claim, and, if so, is compensation for such outstanding rights of the entryman a qualification of the grant? If we base our conclusion solely upon the meaning which has been usually attached to the term, "public land," as used in our federal legislation, it would follow that neither title nor right of way was granted by Congress over land which was subject to a valid homestead entry at the time of the passage of the act, as is held by the majority opinion, but the term "public lands" or "public domain" must be construed in the light of the purpose of congress in the legislation under consideration. As stated in Union Pacific R. Co. v. Harris, supra, "If it is claimed in any given case that they [the words 'public lands'] are used in a different meaning, it should be apparent either from the context or from the circumstances attending the legislation." One of the things to be observed in the context of the act of 1871, adopting the act of 1866, §§ 2 and 3, supra, is that while section 3 expressly reserves from the operation of the grant all lands subject to claims or rights, pre-emption, homestead, etc., section 2, granting the right of way, does so without any reservation whatever. It is a familiar rule that from a change of language a change of intent is implied. Now, if we read into section 2, by virtue of the use of the term, "public domain," the same reservations that are expressly made in section 3 of the act, we have to that extent ignored that fundamental rule of statutory construction. It has been pointed out in numerous decisions that the terms of the grant of the right of way and the character of the ownership under section 2 granting the right of way, and section 3, granting the aid lands, are quite distinct. St. Joseph & D. C. Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578; Central Pacific R. Co. v. Dyer, 5 Fed. Cas. 364, No. 2,552; Nielsen v. Northern Pac. R. Co. (C. C. A.) 184 F. 601; City of Reno v. Southern Pac. Co. (C. C. A.) 268 F. 751; H. A. & L. D. Holland Co. v. Northern Pac. R. Co. (C. C. A.) 214 F. 920. Now, the general purpose of this legislation is well known and is stated by the Supreme Court in U. S. v. Union Pacific R. Co., 91 U. S. 72, 80, 23 L. Ed. 224. To this decision I refer without comment other than to state that it is apparent therefrom that the right of a homesteader or pre-emptor or settler to compensation for a right of way across his land was evidently far from the thoughts of Congress.

The railroad was to be built in "a vast unpeopled territory lying between the Missouri and Sacramento Rivers which was practically worthless without the facilities afforded by a railroad for the transportation of persons and property." Congress made no provision for condemning the rights of settlers or entrymen. It recognized that the benefit derived from the construction of such a railroad would vastly exceed the damage resulting from the taking of a right of way. The loss was imaginary, the gain manifest. Perhaps it would not be going too far to say with Justice Field, speaking for the Supreme Court in St. Joseph & D. C. Railroad Co. v. Baldwin, 103 U. S. 426, 429, 26 L. Ed. 578:

"But the grant of the right of way by the sixth section contains no reservations or exceptions. It is a present absolute grant, subject to no conditions except those necessarily implied, such as that the road shall be constructed and used for the purposes designed. Nor is there anything in the policy of the government with respect to the public lands which would call for any qualification of the terms. Those lands would not be the less valuable for settlement by a road running through them. On the contrary, their value would be greatly enhanced thereby.

"The right of way for the whole distance of the proposed route was a very important part of the aid given. If the company could be compelled to purchase its way over any section that might be occupied in advance of its location, very serious obstacles would be often imposed to the progress of the road. For any loss of lands by settlement or reservation, other lands are given; but for the loss of the right of way by these means, no compensation is provided, nor could any be given by the substitution of another route."

It should be noted, however, that Justice Field was dealing with rights accruing after the grant of July 23, 1866, by section 6 of the act, 14 Stat. 210, granting a right of way to the St. Joseph and Denver City Railroad Co., almost identical in language with section 2 of the Act of July 27, 1866, now under consideration, quoted in the main opinion. Nevertheless, his language is apt as applied to rights that had already accrued.

How far did Congress intend to go in exercising its undoubted power over land owned by the government when it granted the right of way to these transcontinental railroads through the undeveloped and almost wholly unoccupied lands of the government? It may be assumed that in view of the constitutional protection of vested private property

rights that Congress did not intend to grant a right to violate this constitutional provision or to assume the duty of making just compensation to private owners. Consequently that property rights that had ripened into an absolute right to the land against the government should not be taken or occupied without compensation. But what of those who had partly complied with the laws according to which, upon full compliance, the individual would be entitled to the land? I am inclined to think that the reasonable and just conclusion is that as to the right of way the government's title vested in the railroad company, and that a claimant who had made a homestead entry was entitled to compensation for the loss to him of the taking of the right of way. The exact question has not been determined, but the decisions all seem to assume that a homestead entryman would have rights in the land that could not be subordinated to the use of the railroad without compensation. It is true that Justice Field in Bardon v. N. P. R. Co., 145 U. S. 535, 12 S. Ct. 856, 36 L. Ed. 806, arrives at the conclusion that the better rule of construction would not divide the title between two grantees of public land, but would reserve from any subsequent grant all lands that are not free from existing claims, still as to railroad rights of way the converse of the rule is obviously desirable. I therefore concur in the conclusion of the majority that the homestead rights of the appellee's predecessor were superior to the rights of the railroad company to its right of way until compensated therefor. Having reached this conclusion, I find no difficulty in following the majority in holding that the change to a pre-emption claim did not constitute an abandonment of the prior right. On the contrary, it was a consummation thereof.

I therefore agree that the commutation of the homestead right under section 2301, Rev. St., Act of May 20, 1862, c. 75, § 8, 12 Stat. 393, does not operate as an abandonment of the homestead entry, but is a consummation thereof, substituting the payment of the minimum price for the continued residence required under the homestead act. This clearly results from the decision of the Circuit Court for the Eastern District of Wisconsin in U. S. v. Freyberg et al., 32 F. 195, wherein the government was defeated in an action to recover the value of timber cut by a homestead entryman over and above the amount allowed to such an entryman. It was held that by commuting his entry under section 2301, Rev. St., and paying therefor and receiving a land office receipt for the payment his title so far related back to the original entry as to defeat the claim of the government in its action to recover for timber wrongfully cut by the homesteader. The Supreme Court in Bailey v. Sanders, 228 U. S. 603, 33 S. Ct. 602, 57 L. Ed. 985, holds that a purchase of the land by a homesteader under section 2301 is a consummation of the homestead entry, and consequently that the rights of the entryman to make a sale or to agree to make a sale thereof before patent was prohibited.

I therefore concur in the affirmance of the judgment.