## UNITED STATES *v.* OREGON AND CALIFORNIA RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 9. Argued April 14, 1899. — Decided January 8, 1900.

By the act of July 2, 1864, 13 Stat. 365, c. 217, Congress granted lands to the Northern Pacific Railroad Company to aid in the construction of a railroad and telegraph line from a point on Lake Superior in Wisconsin or Minnesota to some point on Puget Sound, with a branch *via* the valley of the Columbia River to a point at or near Portland in the State of Oregon. The grant was of "every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the

Commissioner of the General Land Office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections." In March, 1865, the president of that company filed in the Land Department a map which if of value for any purpose was only a map of "general route," not one of definite location between Wallula and Portland. That map was not accepted. By act of July 25, 1866, 14 Stat. 239, c. 242, Congress made a grant of land in aid of the construction of a railroad and telegraph line between Portland, Oregon, and the Central Pacific Railroad in California. That grant was in the usual terms employed in such acts. Subsequently the benefit of that grant as to the part of the road to be constructed in Oregon was conferred upon the Oregon Central Railroad Company. The lands here in dispute, whether place or indemnity, were within the limits of the grant of 1866. The entire line of road of the Oregon and California Railroad Company, which was the successor of the Oregon Central Railroad Company, was fully constructed and duly accepted by the President, and at the time this suit was begun was being operated and had been continuously operated by that company. The Oregon Company filed its map of definite location in 1870, and it was accepted by the Land Department. By the act of September 29, 1890, 26 Stat. 496, c. 1040, all lands theretofore granted to any State or corporation to aid in the construction of a railroad opposite to or coterminous with the portion of any such railroad not then completed and in operation, for the construction of which such lands were granted, were forfeited to the United States. There never was any withdrawal of indemnity lands on the proposed line of the Northern Pacific Railroad Company between Wallula and Portland, nor was there any definite location or construction of its road opposite to the lands in suit. *Held,*

(1) That nothing in the act of 1864 stood in the way of Congress subsequently granting to other railroad corporations the privilege of earning any lands that might be embraced within the general route of the Northern Pacific Railroad.

(2) That as the grant contained in that act did not include any lands that had been reserved, sold, granted or otherwise appropriated at the time the line of the Northern Pacific Railroad was "definitely fixed;" as the route of the Northern Pacific Railroad had not been definitely fixed at the time the act of July 25, 1866, was passed, or when the line of the Oregon Company was definitely located; as the lands in dispute are within the limits of the grant contained in the act of 1866; as the route of the Oregon Railroad was definitely fixed, at least when the map showing that route was accepted by the Secretary of the Interior on the 29th day of January, 1870, — the Northern Pacific Railroad Company having done

nothing prior to the latter date except to file the Perham map of 1865; and as prior to the forfeiture act of September 29, 1890, there had not been any definite location of the Northern Pacific Railroad opposite the lands in dispute, there is no escape from the conclusion that these lands were lawfully earned by the Oregon Company and were rightfully patented to it. Of course, if the route of the Northern Pacific road had been definitely located before the act of 1890 was passed, and had embraced the lands in dispute, different questions would have been presented.

THE case is stated in the opinion.

*Mr. Solicitor General* for appellant.

*Mr. L. E. Payson* for appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit involves the title to a large body of lands in the State of Oregon covered by patents issued by the United States to the Oregon and California Railroad Company, a corporation organized under the laws of Oregon. Its object is to obtain a decree cancelling those patents as well as certain conveyances made by the company.

The suit was brought by the Attorney General in 1893 under the authority of the act of March 3, 1887, c. 376, entitled "An act to provide for the adjustment of land grants made by Congress to aid in the construction of railroads and for the forfeiture of unearned lands and for other purposes." By that act the Secretary of the Interior was directed to adjust, in accordance with the decisions of this court, each of the railroad land grants made by Congress to aid in the construction of railroads and theretofore unadjusted. Its second section provided that "if it shall appear, upon the completion of such adjustments respectfully, [respectively,] or sooner, that lands have been, from any cause, heretofore erroneously certified or patented, by the United States, to or for the use or benefit of any company claiming by, through or under grant from the United States, to aid in the construction of a railroad, it shall be the duty of the Secretary of the Interior to thereupon

demand from such company a relinquishment or reconveyance to the United States of all such lands, whether within granted or indemnity limits; and if such company shall neglect or fail to so reconvey such lands to the United States within ninety days after the aforesaid demand shall have been made, it shall thereupon be the duty of the Attorney General to commence and prosecute in the proper courts the necessary proceedings to cancel all patents, certification or other evidence of title heretofore issued for such lands, and to restore the title thereof to the United States." 24 Stat. 556, c. 376.

The defendants demurred to the bill for want of equity, but the demurrer was overruled. 57 Fed. Rep. 890. They then filed a joint and several answer and proofs were taken by the parties. By the decree of the Circuit Court patents of May 9, 1871, July 12, 1871, June 22, 1871, and June 18, 1877, purporting to convey to the Oregon and California Railroad Company the lands in dispute (which are fully described by metes and bounds in the decree) were cancelled as being null and void. By the same decree a warranty deed of February 26, 1880, to the defendant John A. Hurlburt, a deed of November 5, 1879, to Jacob Goldstrap — each of which deeds was executed by the railroad company — a deed by Goldstrap to Sylvester Evans, and a deed from the latter to Thomas L. Evans of July 13, 1883, were also cancelled as null and void. 69 Fed. Rep. 899. The case was then carried to the Circuit Court of Appeals where the decree of the Circuit Court was reversed with directions to dismiss the bill. 77 Fed. Rep. 67.

The facts necessary to a clear understanding of the questions raised by the pleadings are as follows:

By an act approved July 25, 1866, c. 242, Congress authorized the California and Oregon Railroad Company, a California corporation, and such company as the legislature of Oregon should thereafter designate, to lay out, locate, construct, finish and maintain a railroad and telegraph line between Portland, Oregon, and the Central Pacific Railroad in California — the Oregon Company to construct that part of the line in Oregon beginning at Portland and running thence southerly through the Willamette, Umpqua and Rogue River valleys to the

southern boundary of Oregon, where it was to connect with the part constructed in California by the California corporation.   14 Stat. 239, 240, 241, c. 242.

For the purpose of aiding in the construction of such railroad and telegraph line and to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores over the line of the railroad, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile (ten on each side) of the railroad line, were granted to those companies, their successors and assigns.   If the alternate sections or parts of sections so granted were found to have been "granted, sold, reserved, occupied by homestead settlers, preempted, or otherwise disposed of," other lands, designated as aforesaid, were to be selected by the companies in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections designated by odd numbers, nearest to and not more than ten miles beyond the limits of the first-named alternate sections. It was made the duty of the Secretary of the Interior, as soon as the companies or either of them filed in his office a map of the survey of the railroad or any portion thereof, not less than sixty continuous miles from either terminus, to withdraw from sale the lands granted on either side of the railroad as far as located and within the limits specified.   § 2.

Whenever the companies or either of them had twenty or more consecutive miles of any portion of the railroad and telegraph line ready for service, it became the duty of the President to appoint three commissioners to examine the same, and when it appeared that twenty consecutive miles of railroad and telegraph had been completed and equipped in all respects as required, the commissioners were to report the fact under oath to the President, whereupon patents were to issue for the lands granted to the extent of and coterminous with the completed section of the railroad and telegraph line; and from time to time whenever twenty or more consecutive miles of road and telegraph were completed and equipped, patents were to be issued upon the report of the commissioners, and so on until the entire railroad and telegraph authorized were constructed.   § 4.

The companies were required to file their assent to the act in the Department of the Interior within one year after its passage, and complete the first section of twenty miles of the railroad and telegraph within two years and at least twenty miles in each year thereafter, and the whole on or before the first day of July, 1875,— the railroad to be of the same gauge as the Central Pacific Railroad of California and connect therewith. § 6.

In case the companies failed to comply with the terms and conditions required by not filing their assent thereto as provided in section six of the act, or by not completing the same as provided in that section, the act was to be null and void, and all the lands not conveyed by patent to the company or companies, as the case might be, at the date of such failure, should revert to the United States; and if the road and telegraph line were not kept in repair and fit for use after the same were completed, Congress could pass an act to put them in repair and use and direct the income therefrom to be devoted to the United States to repay all expenditures caused by the default or neglect of the companies or either of them, or fix pecuniary responsibility not exceeding the value of the lands granted by the act. § 8.

It appears from the bill filed by the United States that, by joint resolution of October 20, 1868, the legislature of Oregon designated the Oregon Central Railroad Company to receive the privileges and franchises and to perform the duties mentioned in the act of July 25, 1866; that on the 29th day of October, 1869, that company, having previously accepted the grant contained in that act, filed with the Secretary of the Interior in its map of "definite location" opposite to the lands in suit; that this map was accepted by the Secretary on January 29, 1870; that in February, 1870, the lands in dispute were all withdrawn in pursuance of orders issued by that officer; that on or about April 4, 1870, the Oregon and California Railroad Company, a corporation of Oregon, became the successor and assignee of the Oregon Central Railroad Company; that the road of that company was duly constructed opposite the lands in dispute within the time limited

by law for the completion of that portion; and that two sections of 20 miles each were examined by commissioners appointed by the President, and their report having been accepted by him patents for the lands coterminous with those sections were ordered to be and were issued.

The bill contained these averments: "Your orator shows that all the lands hereinbefore described are *within the limits of the grant as prescribed in said act of July 25, 1866, whether place or indemnity.* And your orator shows that *the entire line of railroad of the said Oregon and California Railroad Company has been fully constructed and been duly accepted by the President of the United States after due reports by commissioners on the several sections thereof,* and *has been continuously, and still is operated by said company ;* but a portion of said road, to wit, one hundred and sixty-three miles, was constructed after July 1, 1880."

Referring to the conveyances made by the railroad company to the individual defendants, the bill admits that the purchasers went into actual possession, made valuable and permanent improvements and remained thereafter in possession. It then alleges that "John A. Hurlburt and Thomas L. Evans each claim the title to said lands respectively in fee simple, and your orator concedes that they were severally purchased and granted from the said Oregon and California Railroad Company in good faith for value, relying on the apparent title to said lands under said patent from orator to said railroad company, and without actual notice of any defect in the title of said company to said lands, as set forth in this bill. But your orator insists that they were chargeable with constructive notice of the several acts of Congress, and that under the said acts of Congress and the acts and doings of the said railroad company no title could pass to said Hurlburt and Evans, and that said patent should be cancelled as to them as well as to the grantee therein, the said Oregon and California Railroad Company."

In view of these facts, if the case depended alone on the act of July 25, 1866, the title of the defendants to these lands, as against the United States, could not be questioned.

The Government, however, has insisted in its bill that the

issuing of the patents to the Oregon and California Railroad Company was without authority of law. This contention rests upon the assumption that the lands so patented — although within the limits of the grant contained in the act of July 25, 1866, and within the line of the Oregon Company as definitely located — were excluded from that grant because included in the grant previously made to the Northern Pacific Railroad Company by the act of July 2, 1864, c. 217, 13 Stat. 365; in which case, it is insisted that they were forfeited to the United States by the act of September 29, 1890, c. 1040, 26 Stat. 496, and should be so adjudged.

By the last-named act it was among other things provided: "§ 1. That there is hereby forfeited to the United States, and the United States hereby resumes the title thereto, all lands heretofore granted to any State or to any corporation to aid in the construction of a railroad opposite to and coterminous with the portion of any such railroad not now completed, and in operation, for the construction or benefit of which such lands were granted; and all such lands are declared to be a part of the public domain; *Provided,* That this act shall not be construed as forfeiting the right of way or station grounds of any railroad company heretofore granted." "§ 6. That no lands declared forfeited to the United States by this act shall by reason of such forfeiture inure to the benefit of any State or corporation to which lands may have been granted by Congress, except as herein otherwise provided; nor shall this act be construed to enlarge the area of land originally covered by any such grant, or to confer any right upon any State, corporation or person to lands which were excepted from such grant. Nor shall the moiety of the lands granted to any railroad company on account of a main and a branch line appertaining to uncompleted road, and hereby forfeited, within the conflicting limits of the grants for such main and branch lines, when but one of such lines has been completed, inure by virtue of the forfeiture hereby declared to the benefit of the completed line." 26 Stat. 496, c. 1040.

The contention of the Government renders it necessary to

ascertain what interest, if any, was acquired by the Northern Pacific Railroad Company in these lands by virtue of the act of July 2, 1864.

By that act the Northern Pacific Railroad Company was created a corporation with authority to build a railroad and telegraph line from a point on Lake Superior in Wisconsin or Minnesota westerly by the most eligible route, as should be determined by the company, on a line north of the 45th degree of latitude, to some point on Puget's Sound, "with a branch via the valley of the Columbia River to a point at or near Portland, in the State of Oregon, leaving the main trunk line at the most suitable place, not more than three hundred miles from its western terminus." The grant to that company was of "every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, *and* whenever, on the line thereof, the United States have full title, *not* reserved, sold, *granted or otherwise appropriated,* and free from preëmption, or other claims or rights, *at the time* the line of said road is *definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office;* and whenever, *prior to said time,* any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

By other sections of the act it was provided : "§ 6. That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the *general route* shall be fixed, and as fast as may be required by the construction of said railroad ; and the odd sections of land hereby granted shall not be liable to sale, or entry, or preëmption before or after they are surveyed,

except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preëmption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road when surveyed; excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the Government at a price less than two dollars and fifty cents per acre when offered for sale." "§ 8. That each and every grant, right and privilege herein are so made and given to, and accepted by, said Northern Pacific Railroad Company, upon and subject to the following conditions, namely: That the said company shall commence the work on said road within two years from the approval of this act by the President, and shall complete not less than fifty miles per year after the second year, and shall construct, equip, furnish and complete the whole road by the fourth day of July, anno Domini eighteen hundred and seventy-six." By section twenty it was declared that "Congress may, at any time, having due regard for the rights of said Northern Pacific Railroad Company, add to, alter, amend or repeal this act." 13 Stat. 365, c. 217.

On the 6th day of March, 1865, Josiah Perham, President of the Northern Pacific Railroad Company addressed to Mr. Usher, then Secretary of the Interior, the following communication: ".Under authority from the board of directors of the Northern Pacific Railroad Company, I have designated on the accompanying map in red ink the general line of their railroad from a point on Lake Superior, in the State of Wisconsin, to a point on Puget Sound, in Washington Territory, via the Columbia River, adopted by said company as the line of said railroad, subject only to such variations as may be found necessary after more specific surveys, and I respectfully ask that the same may be filed in the office of the Commissioner of the General Land Office, together with a copy of the charter and organization of said company, and that under your directions the lands granted to said company

may be marked and withdrawn from sale in conformity to law."

Under date of March 9, 1865, Secretary Usher wrote to the Commissioner of the General Land Office as follows: "Herewith I transmit a map upon which the 'general line' of the Northern Pacific Railroad, as adopted by the board of directors of that railroad company, is delineated; also a copy of the letter of the president of said company, dated the sixth instant, requesting that the granted lands along said line be withdrawn from the market. In view of the provisions of the third and sixth sections of the act of Congress, approved July 2, 1864, should you perceive no objection, I think that the odd-numbered sections along the line for ten miles in width on each side in Minnesota and Wisconsin, and for twenty miles in width on each side along that part of the line extending through the Territories westward to Puget Sound, may be withdrawn as requested, as preliminary to the final survey and location of said railroad. The even-numbered sections along the line will, however, be subject to disposal by the United States, as provided in the sixth section of said act of Congress."

No immediate reply seems to have been made to the letter of Secretary Usher. But on June 22, 1865, Mr. Wilson, Commissioner of the General Land Office, addressed to Mr. Harlan, then Secretary of the Interior, a communication in which he referred to the above letter of Secretary Usher, and in which he assigned many reasons why the Perham map was wholly inadequate for the purposes intended to be accomplished by it, namely, the withdrawal for the benefit of the Northern Pacific Railroad Company of all the public lands within the exterior lines indicated by that map. Among other things Mr. Wilson said in his communication: "Of course, no withdrawal can now be made on account of the road in the region of country extending across that part of the continent between the west boundary of Minnesota to the eastern surveys of Washington Territory, because over that territory the lines of the public surveys have not yet been established. In this extended locality the withdrawal should only be ordered as the public surveys are advanced and survey

of railroad established, in like manner as indicated under first head. A general withdrawal upon conjectural or uncertain basis might result in shutting out from settlement large bodies of land which an actual survey would show not within the grant, whilst lands would be omitted from the withdrawals which the survey might require to be included. Then, it is not sound policy nor is there any warrant in our land legislation for doing any act the tendency of which would give preference to satisfy a grant on such a stupendous scale as this, whilst individual claims under our general system of land laws, homestead, preëmption and sales would be unaided by any such preliminary discriminating proceeding. The result of a premature withdrawal on uncertain basis would be unjust to the pioneer settler, detrimental to the public interests in arresting the progress of settlement and disposal in that direction of the public domain, and to that extent checking the growth and prosperity of our frontier, and that, too, in the vicinity of a colonial dependence of a powerful nation.; would be a prejudice to the interests of the railroad grant itself in excluding settlers and immigrants, whose labor and means would enhance the value of such lands as in the ordinary progressive operations of the land system would in due time fall to the grant. The land system should be so administered that all the different acts of land legislation may be at the same time in full operation, giving precedence to no one law over another, unless where the terms of the law indicate the public will to be otherwise, leaving corporate or other grantees and individuals respectively to have the benefit of their superior diligence in establishing and completing their several claims according to law. For these considerations this office declines ordering a withdrawal until authenticated maps of the actual survey of the several portions of the route shall be successively filed from time to time to completion, showing the connection of said portions with the lines of the public surveys, yet respectfully submits the foregoing considerations for such directions as the Secretary may be pleased to give in the premises for the government of this office."

On the 10th day of April, 1869, Congress passed a joint resolution granting a right of way for the construction of a railroad from a point at or near Portland, Oregon, to a point west of the Cascade Mountains in Washington Territory. That resolution provided: "That the Northern Pacific Railroad Company be, and hereby is, authorized to extend its branch line from a point at or near Portland, Oregon, to some suitable point on Puget Sound, to be determined by said company, and also to connect the same with its main line west of the Cascade Mountains, in the Territory of Washington; said extension being subject to all the conditions and provisions, and said company in respect thereto being entitled to all the rights and privileges conferred by the act incorporating said company, and all acts additional to and amendatory thereof: *Provided,* That said company shall not be entitled to any subsidy in money, bonds or additional lands of the United States, in respect to said extension of its branch line as aforesaid, except such lands as may be included in the right of way on the line of such extension as it may be located: *And provided further,* That at least twenty-five miles of said extension shall be constructed before the second day of July, eighteen hundred and seventy-one, and forty miles per year thereafter until the whole of said extension shall be completed." 16 Stat. 57. No action was taken under that resolution because it contained no grant of lands; and it is not contended that it has any material bearing on this case. It is referred to merely as part of the history of the grant to the Northern Pacific Railroad.

After the map of the definite location of the Oregon Company had been filed and accepted, namely, on the 31st of May, 1870, Congress passed a joint resolution authorizing the Northern Pacific Railroad Company to issue bonds to aid in the construction and equipment of its road, " and to secure the same by mortgage on its property and rights of property of all kinds and descriptions, real, personal and mixed, including its franchise as a corporation; . . . and also to locate and construct, under the provisions and with the privileges, grants and duties provided for in its act of incorporation, its main

road to some point on Puget Sound, via the valley of the Columbia River, with the right to locate and construct its branch from some convenient point on its main trunk line across the Cascade Mountains to Puget Sound; and in the event of there not being in any State or Territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by Congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the Secretary of the Interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such State or Territory, within ten miles on each side of said road, beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company of 1864, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, preëmpted or otherwise disposed of subsequent to the passage of the act of July 2, 1864. And that twenty-five miles of said main line between its western terminus and the city of Portland, in the State of Oregon, shall be completed by the first day of January, Anno Domini eighteen hundred and seventy-two, and forty miles of the remaining portion thereof each year thereafter, until the whole shall be completed between said points." 16 Stat. 378. As said by Mr. Justice Lamar, when Secretary of the Interior : "By this resolution the designation of the lines of the road was changed; that which by the granting act [July 2, 1864] was known as the branch line (via the valley of the Columbia River to a point at or near Portland, in the State of Oregon,) was changed to main road or main line, and that which had been designated as main line (crossing the Cascade Mountains to Puget Sound) was changed to branch line." 6 L. D. 400 ; *United States* v. *Northern Pacific Railroad Co.*, 152 U. S. 284, 299.

On the 4th day of August, 1870, two maps, constituting a map of general route of the Northern Pacific Railroad Company, were presented to the Secretary of the Interior. The bill alleged that those maps designated a route following the

Columbia River from Wallula, Washington Territory, to a point on the north side of that river opposite Portland, Oregon, and that the Secretary of the Interior on the 13th day of August, 1870, in due form accepted them and directed the withdrawal of lands opposite that line. Withdrawals were accordingly made August 13, 1870, and October 27, 1870, and they embraced the lands here in controversy. The bill referred to these maps as maps of "general route," but in an amended bill the Government reserved the right to insist, if it should be thereafter advised to do so, that the map filed August 4, 1870, and the one filed March 6, 1865, "were maps of definite location of said Northern Pacific Railroad of its line from Wallulla Junction to Portland, Oregon."

There never was any withdrawal of indemnity lands on the proposed line between Wallula and Portland, nor any *definite location or construction* of the road of the Northern Pacific Railroad Company *opposite to the lands in suit.*

Proceeding to the consideration of the case upon its merits, we observe that many questions of difficulty and importance have been discussed by learned counsel both at the bar and in their printed arguments which we do not deem it necessary to determine. In our judgment, the case is within a very narrow compass.

What was the extent of the grant of public lands made to the Northern Pacific Railroad Company by the act of July 2, 1864? That grant did not embrace all the odd-numbered sections within the exterior lines of any general route that might have been adopted by the company, nor all within the forty miles in width that might have been surveyed under the order of the President (§ 6) on each side of the entire line of the road after such general route had been designated. It was in the nature of a "float," no right or title to any particular section becoming certain until a definite location of route. *Missouri, Kansas & Texas Railway* v. *Kansas Pac. Railway,* 97 U. S. 491; *Grinnell* v. *Railroad Co.,* 103 U. S. 739, 742; *Van Wyck* v. *Knevals,* 106 U. S. 360, 366; *Kansas Pacific Railway* v. *Dunmeyer,* 113 U. S. 629, 634; *Wisconsin Central Railroad* v. *Price County,* 133 U. S. 496; *Deseret*

*Salt Co.* v. *Tarpey*, 142 U. S. 241; *Sioux City Land Co.* v. *Griffey*, 143 U. S. 32, 38; *United States* v. *Southern Pacific Railroad*, 146 U. S. 570, 594; *Menotti* v. *Dillon*, 167 U. S. 703, 719; *Southern Pacific Railroad* v. *United States*, 168 U. S. 1.

In *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55, 71, 72, this court, speaking by Mr. Justice Field, referred to the act of 1864 and said that it contemplated "the filing by the company, in the office of the Commissioner of the General Land Office, of a map showing the *definite location* of the line of its road, and *limits* the grant to such alternate odd sections as have not, *at that time*, been reserved, sold, granted or otherwise appropriated, and free from preëmption, grant or other claims or rights. . . . Nor is there anything inconsistent with this view of the sixth section as to the general route, in the clause in the third section making the grant *operative only* upon such odd sections as have *not* been reserved, sold, granted or otherwise appropriated, and to which preëmption and other rights and claims have not attached, *when a map of the definite location has been filed.*"

In *United States* v. *Northern Pacific Railroad Company*, 152 U. S. 284, 296, it was held that "the act of 1864 granted to the Northern Pacific Railroad Company *only* public lands to which the United States had full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights *at the time* its line of road was *definitely fixed*, and a plat thereof filed in the office of the Commissioner of the General Land Office." Subsequently in *Northern Pacific Railroad* v. *Sanders*, 166 U. S. 620, 629, it was said that "the act of July 2, 1864, under which the railroad company claims title *excluded* from the grant made by it all lands that were *not, at the time the line of the road was definitely fixed,* free from preëmption or other claims or rights."

If therefore the Perham map of 1865 were conceded for the purposes of the present discussion to have been sufficient as a map of "general route" — and nothing more can possibly be claimed for it — these lands could not be regarded as hav-

ing been brought by that map (even if it had been accepted) within the grant to the Northern Pacific Railroad Company, and thereby have become so segregated from the public domain as to preclude the possibility of their being earned by other railroad companies under statutes enacted by Congress after the filing of that map and before any definite location by the company of its line.

There are some general expressions in *Buttz* v. *Northern Pacific Railroad,* above cited, which, counsel insists, indicate a different view. In that case Mr. Justice Field said that when the general route of the Northern Pacific Railroad was fixed and information thereof given to the Land Department by filing the map of such route, "*the law* withdraws from sale or preëmption the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain : it is to preserve the land for the company to which, in aid of the construction of the road, it is granted." This language was too broad if it is construed to express the thought that public lands, when within the exterior lines of a "general route," are "appropriated" from the time the map of such route is filed, so as to prevent them from being granted by Congress to and from being earned by another railroad corporation prior to the filing of a map of definite location by the company designating such general route. In *Northern Pacific Railroad* v. *Sanders,* 166 U. S. 620, 634, 635, 636, this court, referring to the act of July 2, 1864, said : "The company acquired, by fixing its general route, only an inchoate right to the odd-numbered sections granted by Congress, and no right attached to any specific section until the road was definitely located and the map thereof filed and accepted. Until such definite location it was competent for Congress to dispose of the public lands on the general route of the road as it saw proper. Provision for indemnification of the company in such an emergency was made by a clause in the act of 1864, providing that wherever, prior to the date of definite location, 'any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted or otherwise disposed of, other lands shall

be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of such alternate sections.' 13 Stat. 368. Hence it was said in *Barden* v. *Northern Pacific Railroad Company,* 154 U. S. 288, 320, in which case the act of 1864 was construed, that the privilege of exploring for mineral lands was in full force at the time of the location of the definite lines of the road, and was a right reserved and excepted out of the grant at that time." In the same case it was also observed: "Much was said at the bar as to the decision of this court in *Buttz* v. *Northern Pacific Railroad,* 119 U. S. 55. On one side it is said that that case construes the sixth section of the act of 1864 as excluding the possibility of *any* right being acquired adversely to the railroad company to an odd-numbered section embraced by the exterior lines of the general route after that route had been established. On the other side it is contended that the only point necessary to be determined and the only one judicially determined in that case was that the defendant could not initiate a preëmption right to the land there in dispute so long as the Indian title referred to in the opinion was unextinguished. Without stopping to examine these contentions, it is sufficient to say that the *Buttz case* involved no inquiry as to the respective rights of the railroad company under the act of 1864 and of parties making applications in due form prior to the definite location of its road to purchase lands as mineral lands that were within the exterior lines of its general route. Mr. Justice Field delivered the opinion in the *Buttz case,* and, speaking for the court in *Barden* v. *Northern Pacific Railroad Company,* above cited, stated that the grant in that act excepted the privilege of exploring for mineral lands. For the reasons stated we adjudge that the lands in question were excluded from the grant of 1864 by reason of the pendency of record, at the time of the definite location of the plaintiff's road, of application to purchase them as mineral lands, such applications being in the form prescribed by the acts of Congress that related to such lands, and undetermined when the company filed its map of definite location."

. . We take it then to be indisputable that even if the Perham map of 1865 were regarded as a sufficient map of the " general route " of the Northern Pacific Railroad, and not, to use the language of Judge Ross in this case, a mere sketch or diagram unauthenticated by any engineer or officer charged with the duty of designating such a route, nothing stood in the way of Congress granting to another railroad company any lands within the exterior lines of that route, by a statute passed after such map was filed in the Land Department and before a definite location of the Northern Pacific Railroad. Such a statute was that of July 25, 1866, granting lands to aid in the construction of a railroad from the Central Pacific Railroad in California to Portland, Oregon. That the lands here in dispute — even if within the general route of the Northern Pacific Railroad as defined by the Perham map of 1865 — are within the exterior limits of the grant to the Oregon Company contained in the subsequent act of 1866, is expressly averred in the bill filed by the United States.

Upon the question whether it was within the power of Congress to have granted to the Oregon Company in 1866 lands embraced within the exterior lines of the general route as defined by the Perham map of 1865, reference need only be made to *United States* v. *Union Pacific Railway*, 160 U. S. 1, 33, and *Menotti* v. *Dillon*, 167 U. S. 703, 719–720.

In *Menotti* v. *Dillon*, the principal question was as to the rights acquired by a railroad company in virtue of its having filed its map of general route and the withdrawal by executive order of certain lands within the exterior lines of that route from preëmption, private entry and sale — all before the passage of a subsequent act under which one of the parties claimed title to the land in dispute, the other claiming under the railroad company. This court said : " It is said that the railroad company filed its map of general route on the 8th of December, 1864, and that these lands having been withdrawn from preëmption, private entry and sale by the executive order of January 30, 1865, they were not embraced by the act of 1866. In our opinion this is not a proper interpretation of that act. The proviso of the first section distinctly indicates

certain cases to which the act should not apply; and, distinctly excluding those cases, but no others, from its operation, the act, in express words, confirmed to the State, 'in all cases,' lands which the State had theretofore selected in satisfaction of any grant by Congress and sold to purchasers in good faith under its laws. No exception is made of lands which, at the date of the passage of the act, were withdrawn from preëmption, private entry and sale pursuant to the filing by the railroad company of its map of *general* route. And the court should not construe the act as excluding lands in that condition, unless it is prepared to hold that Congress had no power to confirm to the State lands which, at the time, were simply withdrawn from preëmption, private entry or sale for railroad purposes. We cannot so adjudge. The withdrawal order of January 30, 1865, did not, in our judgment, stand in the way of the passage of such an act as that of 1866; first, because the acts of 1862 and 1864 by necessary implication recognized the right of Congress to dispose of the odd-numbered sections, or any of them, within certain limits on each side of the road, at any time prior to the definite location of the line of the railroad; second, Congress reserved the power to alter, amend or repeal each act; third, the filing of the map of general route gave the railroad company no claim to any specific lands within the exterior limits of such route on either side of the road, the rule being that a grant of public lands in aid of the construction of a railroad is, until its route is established, in the nature of a 'float,' and title does not attach to specific sections until they are identified by an accepted map of definite location of the line of road to be constructed. The railroad company accepted the grant subject to the possibility that Congress might, in its discretion, and prior to the definite location of its line, sell, reserve or dispose of enumerated sections for other purposes than those originally contemplated. *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629, 639, 644; *United States* v. *Southern Pacific Railroad*, 146 U. S. 570, 593. In *Northern Pacific Railroad* v. *Sanders*, 166 U. S. 620, 634, we said: 'The company acquired, by fixing its general route, only an inchoate right to the odd-

numbered sections granted by Congress, and no right attached to any specific section until the road was definitely located, and the map thereof filed and accepted. Until such definite location it was competent for Congress to dispose of the public lands on the general route of the road as it saw proper.'"

Again in the same case : "It is true, as said in many cases, that the object of an executive order withdrawing from preemption, private entry and sale lands within the general route of a railroad is to preserve the lands unincumbered until the completion and acceptance of the road. But where the grant was, as here, of odd-numbered sections, within certain exterior lines, 'not sold, reserved or otherwise disposed of by the United States, and to which a preëmption or homestead claim may not have attached, at the time the line of said road is definitely fixed,' the filing of a map of general route and the issuing of a withdrawal order did not prevent the United States, by legislation at any time prior to the definite location of the road, from selling, reserving or otherwise disposing of any of the lands which, but for such legislation, would have become, in virtue of such definite location, the property of the railroad company. Especially must this be true where the grant is made subject to the reserved power of Congress to add to, alter, amend or repeal the act containing such grant. The act of 1866 did not take from the railroad company any lands to which it had then acquired an absolute right. The right it acquired in virtue of the act making the grant and of the accepted map of its general route was to earn such of the lands within the exterior lines of that route as were not sold, reserved or disposed of, or to which no preëmption or homestead claim had attached, at the time of the definite location of its road. The act did not violate any contract between the United States and the railroad company, for the reason that the contract itself recognized the right of Congress, at any time before the line of road was definitely located, to dispose of odd-numbered sections granted. It was one that disposed of the lands in question before the definite location of the road. It dedicated these and like lands, part of the public domain, to the specific purposes stated in its provisions, and to

that extent removed the restrictions created by the withdrawal order of 1865, leaving that order in full force as to other lands embraced by it. *Bullard* v. *Des Moines & Fort Dodge Railroad*, 122 U. S. 167, 174. That order took these lands out of the public domain as between the railroad company and individuals, but they remained public lands under the full control of Congress, to be disposed of by it in its discretion at any time before they became the property of the company under an accepted definite location of its road. We cannot doubt that the act of 1866 was a legal exertion of the power of Congress over the public domain."

As the grant contained in the act of July 2, 1864, did not include any lands that had been reserved, sold, granted or otherwise appropriated at the time the line of the Northern Pacific Railroad was " definitely fixed;" as the route of the Northern Pacific Railroad had not been definitely fixed at the time the act of July 25, 1866, was passed, or when the line of the Oregon Company was definitely located; as the lands in dispute are within the limits of the grant contained in the act of 1866; as the route of the Oregon Railroad was definitely fixed, at least when the map showing that route was accepted by the Secretary of the Interior on the 29th day of January, 1870 — the Northern Pacific Railroad Company having done nothing prior to the latter date except to file the Perham map of 1865; and as prior to the forfeiture act of September 29, 1890, there had not been any definite location of the Northern Pacific Railroad opposite the lands in dispute, there is no escape from the conclusion that these lands were lawfully earned by the Oregon Company and were rightly patented to it. Of course, if the route of the Northern Pacific road had been definitely located before the act of 1890 was passed, and had embraced the lands in dispute, different questions would have been presented.

In opposition to the views we have expressed it may be said that the clause in the act of July 25, 1866, providing for the selection under the direction of the Secretary of the Interior of lands for the Oregon Company in lieu of any that should " be found to have been granted, sold, reserved, occupied by

homestead sellers, preëmpted or otherwise disposed of," shows that Congress did not intend to include in but intended to exclude from the grant to that company any lands that could have been earned by the Northern Pacific Railroad Company by definitely fixing its route and filing its map of definite location. Undoubtedly those lands would be regarded as having been appropriated when the route of the Oregon road was definitely located, if prior to that date the route of the Northern Pacific Railroad had been definitely fixed, and if such lands were within the exterior lines of that route. But, as we have said, these lands were within the limits of the grant of July 25, 1866, and had not, *at that time*, or when the route of the Oregon road was definitely located, been appropriated for the benefit of the Northern Pacific Railroad Company, for the reason that the latter company had not then filed any map of definite location. The Northern Pacific Railroad Company could take no lands except such as were unappropriated at the time its line was definitely fixed. It accepted the grant of 1864 subject to the possibility that Congress might, before its line was definitely fixed, authorize other railroad corporations to appropriate lands within its general route, allowing it to select other lands in lieu of any so appropriated. The lands here in dispute were consequently subject to be disposed of by Congress when the act of 1866 was passed; and (the line of the Northern Pacific Railroad not having been definitely located prior to the passage of the forfeiture act of 1890) the Oregon Company became entitled to take the lands and to receive patents therefor in virtue of its accepted map of definite location.

Touching the joint resolution of May 31, 1870, it is clear that whatever may be its scope, no previously vested right of the Oregon Company was affected or was intended to be affected by that resolution. On the contrary, the resolution on its face indicates that some of the lands which the Northern Pacific Railroad Company may have been entitled to earn had been or might have been granted or otherwise disposed of "subsequent to the passage of the act of July 2, 1864," and in lieu thereof that company was authorized under the direction

of the Secretary of the Interior to receive other lands. The only effect therefore of the joint resolution, as between the Northern Pacific Railroad Company and the Oregon Company, was to confer upon the former company the right to receive other lands in lieu of those appropriated by the latter company under the authority of the act of 1866.

Passing by as unnecessary to be determined other questions discussed by counsel, we adjudge that the Circuit Court erred in cancelling the patents referred to in the bill, and that the reversal by the Circuit Court of Appeals of the decree of the Circuit Court and the remanding of the cause with directions to dismiss the bill was right.

The decree of the Circuit Court of Appeals is

*Affirmed.*

Mr. Justice McKenna did not participate in the decision of this case.